FREDERICKA HOMBERG WICKER, Judge.
|sThe State of Louisiana, defendant, appeals the judgment of the trial court in favor of the plaintiffs, Sid-Mar’s Restaurant & Lounge, Inc., Marion G. Burgess, and Sidney K. Burgess (hereinafter collectively “Sid-Mar’s”), finding that Sid-Mar’s had acquired ownership of certain Lots, in whole in or part, in Square 128 of the Metairieville subdivision of Jefferson Parish. Sid-Mar’s answers this appeal requesting that this Court clarify the trial court’s judgment as to what portion of Lot 4 of Square 128 and Plane Street it owns, as well as whether its “economic rights” relative to its lease of the area north of its “restaurant property” were interfered with by the State’s 2006 commandeering order. For the following reasons, we affirm the trial court’s judgment and render the specific finding that Sid-Mar’s is the owner of the portion of Lot 4 and Plane Street that was within Sid-Mar’s “restaurant property” as described in the petition. We also find that Sid-Mar’s lease of the property to the north of its “restaurant property” was interfered with by the State’s 2006 commandeering order.

\ ¿PROCEDURAL HISTORY

Sid-Mar’s filed suit against the State “through the governor and/or the division of administration, state land office” on June 2, 2006, alleging the State had illegally taken its “restaurant property” and interfered with its economic rights relative to the area north of its “restaurant property” without just compensation. Sid-Mar’s alleged that the State accomplished this taking when the restaurant property was commandeered as a result of Governor Blanco’s February 10, 2006 executive order.
The State answered Sid-Mar’s petition in early 2007.[1] In its answer, the State admitted “that Executive Order KBB 2006-6 was issued on February 10, 2006 ... [and] that the executive order commandeered the ‘use’ of the property described therein for certain necessary work by the Corps of Engineers.” The State *191 further admitted that it had not offered any compensation to Sid-Mar’s as a result of its commandeering of the property Sid-Mar’s claimed. The State denied that Sid-Mar’s had owned the property it claimed.
On June 2, 2009, the State moved for “leave to file a third party demand” against the U.S. Army Corps of Engineers. The State argued that it had entered into a cooperation agreement with the Corps whereby the State agreed to commandeer certain property, which included the property Sid-Mar’s claimed, and that the Corps would, in turn, condemn that property, take that property, pay the owners of that property, and build a pumping station on that property. The State alleged that the Corps had breached its agreement with the State by failing to condemn Sid-Mar’s property and provide payments for Sid-Mar’s property and damages.
lsOn June 3, 2009, while this suit was still pending, the United States filed two Complaints in Condemnation in the United States District Court for the Eastern District of Louisiana. One complaint addressed a .088 acre tract, the other addressed a .166 acre tract. Those suits were later consolidated. The entities said to have an interest in the property were Sid-Mar’s, the Sheriff as ex-officio Tax Collector for Jefferson Parish, the State of Louisiana, and certain unknown owners. The parcels that Sid-Mar’s claims in this state court suit were among the parcels that were affected by the combined federal condemnation suit.
On June 5, 2009, Sid-Mar’s filed a motion for partial summary judgment seeking a judgment by the trial court that it owned the land it described as its “restaurant property” as of February 10, 2006, the date Governor Blanco issued her condemnation order.
On July 20, 2009, the East Jefferson Levee District Board of Commissioners (“EJLD”) moved for leave to file a petition of intervention, arguing that it was a necessary party in this litigation because it had an ownership interest in part of the property claimed by Sid-Mar’s. On April 24, 2013, the trial court issued an order allowing the EJLD to intervene in this action.[2] Just before trial, on April 29, 2013, Sid-Mar’s answered the EJLD’s petition for intervention.
On July 21, 2009, the U.S. District Court issued an order staying the proceedings in this case. This stay remained in effect until December 18, 2012, when the U.S. District Court lifted the stay on this state court suit “for the limited purpose of determining title.”[3]
*192 [fiOn January 15, 2013, Sid-Mar’s moved for a partial summary judgment, seeking a judgment by the trial court finding that the Governor’s 2006 Commandeering Order “constituted a compensable taking by the State of Louisiana ..., by which the State of Louisiana acquired the relevant interest in the property identified in the Commandeering Order.” The trial court granted Sid-Mar’s motion for partial summary judgment on March 21, 2013, finding that “the Commandeering Order issued by Governor Kathleen B. Blanco on February 10, 2006 effected a ‘taking’ of plaintiffs’ property by the State of Louisiana. Accordingly, plaintiffs are entitled to compensation as allowed by Louisiana law.”[4] The State sought writs of supervisory review of this decision to both this Court and the Louisiana Supreme Court. Those writs were denied. Sid-Mar’s Restaurant & Lounge, Inc., et al. v. State of Louisiana, 13-420 (La.App. 5 Cir. 5/16/13) (unpublished writ) (stating, “After de novo review of the application and accompanying exhibits, we find no error in the trial court’s ruling of March 21, 2013, granting summary judgment in favor of the plaintiff.”); Sid-Mar’s Restaurant & Lounge, Inc., et al. v. State of Louisiana, 13-1519 (La.10/4/2013), 122 So.3d 1021.
On March 5, 2013, the State filed both an exception of nonjoinder and a motion for partial summary judgment. In its exception of nonjoinder, the State argued that Sid-Mar’s erred in failing to join the U.S. Army Corps of Engineers as a defendant in this action. In its motion for partial summary judgment, the State sought to defeat any claim by Sid-Mar’s that it had obtained ownership rights in the disputed property through acquisitive prescription. After a hearing on March 1722, 2013, the trial court issued an oral ruling denying both this exception and this motion for partial summary judgment.[5]
On March 26, 2013, the trial court issued a written judgment wherein it memorialized its denial of the State’s March 5, 2013 exception of nonjoinder and motion for partial summary judgment. In that judgment, the trial court also denied the State’s June 2, 2009 motion for leave to file a third-party petition.
On April 29, 30, and May 1, 2013, the lower court held a trial on the merits. On August 9, 2013, the trial court issued a written judgment wherein it found that:
[Sid-Mar’s owns] all of the property at issue in this litigation and identified as ‘Restaurant Property[5] except for Square 128, Lot 3 which is the property of the East Jefferson Levee District (formerly the Pontchartrain Levee District).... The State did not prove any portion of these Lots were ever part of the bed of Lake Pontchartrain.
The State moved for a suspensive appeal of this judgment on August 30, 2013. The trial court granted the State’s suspensive appeal on September 4, 2013. Sid-Mar’s thereafter answered the State’s appeal. This decision now follows.

FACTS

In 1947, Mr. Leroy C. and Mrs. Marguerite Shultz bought Lots 1, 2, and 3 of Square 128 in the Metairieville subdivision of Jefferson Parish. These Lots comprise a part of the now-disputed “restaurant property.” Thereafter, Mr. and Mrs. *193 Shultz lived on, and began to possess as owners, the entire “restaurant property.” The “restaurant property” included the collection of Lots 1, 2, and 3, to which the Shultzs had title, as well as, portions of Lots 4, and 19 through 24, which the Shultzs possessed as owners.
In 1949, the Pontchartrain Levee District Board of Commissioners (PLD) attempted to appropriate without compensation an area of land which included the 1 ^“restaurant property.” In 1950, the Shulzs filed suit against the PLD and the district court rendered judgment in favor of the Shultzs. The PLD paid the Shultzs $5,440.00 for Lots 1, 2, and 3. The record reveals no compensation payment for Lots 4 and 19 through 24. Thereafter, the PLD quitclaimed Lots 1 and 2 to the Shultzs.
In 1967, Marion Burgess and her husband, Sidney Burgess, Sr., both now deceased, opened a restaurant, then operated as a proprietorship, that they named “Sid-Mar’s Restaurant.” In 1972, the Shultzs leased part of the “restaurant property” to Mr. and Mrs. Burgess. This allowed Mr. and Mrs. Burgess to move “Sid-Mar’s Restaurant” to the “restaurant property.”
From 1972 and until Hurricane Katrina in 2005, Mr. and Mrs. Burgess, and later Sid-Mar’s Restaurant & Lounge Inc., owned and operated “Sid-Mar’s Restaurant” on the “restaurant property.”[6]
From 1972 until 1977, Mr. and Mrs. Burgess leased the space for Sid-Mar’s Restaurant from the Shultzs, who, during the pendency of the lease, resided in a home on the property separate from the restaurant building. Following the death of Marguerite and Leroy C. Shultz, Sid-Mar’s (Mr. and Mrs. Burgess, and later Sid-Mar’s Restaurant & Lounge Inc.) continued to lease the restaurant space from the Shultz heirs, who, like their parents, occupied the home on the property. From 1972 until 1991, the “restaurant property” was comprised of both the area the Shultzs leased to Sid-Mar’s, and area on which the Shultz family members resided.[7]
On September 30, 1991, Sid-Mar’s purchased the “restaurant property” from the Shultzs through an act of sale which conveyed to them: Lots 1, 2, and 3 of l9Square 128; together with “any ownership or pos-sessory interests or other rights or claims [the Shultzs] may have [had] on the lands abutting or contiguous thereto.” After this sale, Sid-Mar’s possessed, as owner, the entire “restaurant property.” This included both the area which had been leased for the Sid-Mar’s Restaurant from 1972 until the 1991 purchase, as well as, the other portion of the “restaurant property,” the area on which the Shultz family members had resided and possessed as owners.
Hurricane Katrina destroyed Sid-Mar’s Restaurant and its surrounding structures on August 29, 2005. Although Sid-Mar’s began taking steps to rebuild the restaurant in Katrina’s immediate aftermath, they were thwarted when the Governor “commandeered” their “restaurant property,” by Executive Order No. KBB-2006— 6. The Governor issued this commandeering order anticipating that the U.S. Army Corps of Engineers would build a pumping station at the affected location.[8]

*194
\ DISCUSSION

In this appeal, the State assigns two errors of the trial court.[9] First, the State argues the trial court erred in failing to find that all of the disputed property, except for portions of Lots 1 and 2, was a former lake bottom and therefore not susceptible to acquisitive prescription in favor of Sid-Mar’s. Second, as to the parts of the “restaurant property” outside of Lots 1 and 2 of Square 128, the State argues the trial court erred in finding that Sid-Mar’s owns by acquisitive prescription the “restaurant property” because that area is owned by the Pontchartrain Levee District. This part of the “restaurant property” is comprised of portions of Lot 4 and Lots 19 through 24. Sid-Mar’s answers this appeal, asking this Court to clarify the trial court’s judgment as to Lot 4, and the property Sid-Mar’s leased north of the “restaurant property.” We address each of these arguments in turn.

Assignment One

In its first assignment of error, the State argues the trial court erred in failing to find that the entirety of the “restaurant property” is a former lake bed and thus not susceptible to acquisitive prescription. To address these assignments of error, we must address a threshold question of whether the trial court was manifestly erroneous in its finding that no part of the disputed property was a lake bed which at some point was under the waters of Lake Pontchartrain.
If the disputed property is a former lake bottom, it is owned by the State. La. C.C. art. 450. If the disputed property is owned by the State, it may not be alienated from the State though acquisitive prescription by a private party, such as Sid-Mar’s. La. Const. art. IX, § 4 (Lands ... of the state ... or “of a levee district shall not be lost by prescription.... ”); La. R.S. 38:317 (“The prescription by |nwhich the ownership of property is acquired as defined by Article 3446 of the Louisiana Civil Code shall not run against any levee district or levee and drainage district or against the board of commissioners of any levee district or levee and drainage dis *195 trict.”). The Louisiana Constitution also prohibits alienation of the disputed property if it was a lake bed, unless the alienation was for the purpose of reclamation by a riparian owner to recover land lost through erosion. La. Const. art. IX, § 3 (“The legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body, except for purposes of reclamation by the riparian owner to recover land lost through erosion.... ”). The trial court’s determination of whether the disputed property was a former lake bottom is a question of fact subject to review for manifest error. Walker Lands, Inc. v. E. Carroll Parish Police Jury, 38, 376 (La.App. 2 Cir. 4/14/04), 871 So.2d 1258, 1263, writ denied, 04-1421 (La.6/3/05), 903 So.2d 442; Stobart v. State through Dept. of Transp. & Development, 617 So.2d 880 (La.1993).
The State argues that the only reasonable conclusion from the evidence is that the “restaurant property” is a former lake bed. At trial, in support of this argument, the State presented the testimony of Andrew Oliver, Clay Carter, Dr. George Castille, III, and Gregory D’Angelo. Through the authentication by these witnesses, the State admitted numerous survey plats, photographs, and other documents into evidence.
Mr. Oliver, a Public Lands Field Officer with the Louisiana State Land Office, testified that he researched the possible owners by title of Sid-Mar’s property for the State in the aftermath of Hurricane Katrina. Mr. Oliver authenticated, inter alia, State’s Exhibits 8(i), 36(iv), and 29(vi):
• State’s Exhibit 8(i) is the western half of a map of New Orleans and its surrounding area dated with the year 1909. This map shows the now-disputed square 128 as partially eroded by the shoreline of Lake 112Pont char train. However, these maps do not show individual Lots within square 128.
• State’s Exhibit 36(iv) is a survey dated March 1, 1961 of Lots 1, 2, 3, 4, 24, the levee, the location of Lake Pontchartrain, Lake Street, Plane Street, and Orpheum Avenue. It was created for “Mr. and Mrs. Leroy Shultz and Board of Commissioners of the Pontchartrain Levee District.” Mr. Oliver testified that the PLD began construction of a levee in 1949, and that in connection with that, the PLD had appropriated the Shultzs’ property. Mr. Oliver identified this document as resulting from a lawsuit arising from the Shultzs’ lawsuit against the PLD over this appropriation and stated that it depicted the areas affected by the appropriation and the Shultzs’ subsequent law suit.
• State’s Exhibit 29(vi) is an aerial photograph of the disputed area, Mr. Oliver testified that it was taken in the 1990s. This photograph appears to show all of Sid-Mar’s property on dry land.
Mr. Oliver admitted that he had no evidence or personal knowledge to contradict Mr. Sidney K. Burgess’s testimony that between 1972 and 2005 there was no activity taken to try to reclaim land from Lake Pontchartrain. Mr. Oliver confirmed that construction on a pumping station began on and near the property Sid-Mar’s claimed after Hurricane Katrina.
Mr. Carter, a Public Lands Utilization Manager at the Louisiana State Land Office, testified that, as a part of his employment, he has tried to lease the State’s land on the bottom of Lake Pontchartrain. Mr. Carter testified that based on his work, he concluded that the “southern boundary” of Lake Pontchartrain’s shoreline was the south line of Plane Street. Mr. Carter also testified that there were no permits *196 for reclamation of land that was lost due to erosion in the State Land Office’s files.
Dr. Castille, an expert in Historical Archeology, Geography, and water bottoms issues, testified relative to work he performed for the State Land Office in 2003 and 2012. In 2003, Dr. Castille performed contract work for the State Land Office looking into a number of camps on the Jefferson Parish side of the 17th | lsStreet Canal. While the eastern portions of these camps were on dry land, the western portions of these camps extended out over the water of Lake Pontehartrain. The State Land Office tasked Dr. Castille with determining whether the land under the eastern portions of these camps belonged to the State. Dr. Castille testified that as a result of this work, he produced a report which, inter alia, depicted what he believed was the southern shoreline of Lake Pontehartrain in the now-disputed area. According to that report by Dr. Castille, the southern shoreline of Lake Pontchartrain ran along the southern boundary of “Plane Street.”
In 2012, Dr. Castille conducted four “shovel tests” on the western halves of Lots 1 and 2 of Square 128 to determine whether the now-disputed “restaurant property” was formerly part of the bed of Lake Pontehartrain. These shovel tests consisted of Dr. Castille digging four holes in the ground to a depth below the ordinary mean high-water mark of Lake Pontehartrain. When Dr. Castille dug these holes, he found artificial fill below Lake Pontchartrain’s ordinary mean high-water mark. From this, Dr. Castille concluded that the land on the western halves of Lots 1 and 2 had eroded, become part of the bed of Lake Pontehartrain, and then had artificial fill placed on it to make it dry land. Dr. Castille testified that the items which he found in his “shovel tests,” such as rusted nails, appeared to have been in the ground for many years.
On cross-examination, Dr. Castille admitted that when he conducted his 2012 “shovel tests” on the property that Sid-Mar’s formerly occupied, the State and the Army Corps had had control of that area for several years (since the 2006 Commandeering Order). Dr. Castille further admitted that he did not know what activity the State or the Army Corps undertook while they were in possession of the land for that time.
|14 Gregory D’Angelo, an expert in title examination and title opinions, investigated the claims of ownership in Square 128 by Sid-Mar’s and the State in 2009.[10] At trial, Mr. D’Angelo testified relative to State’s Exhibit 14 and 20. State’s Exhibit 14, a survey plat dated August 14, 1947, showed Lake Pontchartrain’s shoreline encroaching into Lots 1 and 2, but not Lot 3. This August 14, 1947 survey plat was attached to the act of sale by which Mr. and Mrs. Shultz bought Lots 1, 2, and 3 on November 13, 1947. State’s Exhibit 20 is the PLD’s quitclaim to the Shultzs, with an attached survey plat dated Sept. 13, 1960 and revised on March 1, 1961. Mr. D’Angelo opined that it was significant that this survey plat: measured the metes and bounds of Lots 1, 2, and 3 of Square 128; identified the streets surrounding Square 128 for orientation purposes; and featured the shoreline of Lake Pontehartrain encroaching significantly into Lots 1, 2, and 3. Mr. D’Angelo opined that these depictions of the shoreline encroaching into Lots 1, 2, and 3, were significant to determine the ownership of the full extent of these Lots.
In opposition to this evidence, Sid-Mar’s elicited testimony from Sidney Kent Bur *197 gess, Jr. and William D. Reeves and presented various exhibits of its own.
Sidney Kent Burgess, Jr. testified that his now-deceased parents, Sidney Burgess, Sr. and Marion Gemelli Burgess, founded Sid-Mar’s Restaurant in 1967 and moved it to the now-disputed “restaurant property” area in 1972. Mr. Burgess testified that, starting in 1972, Sid-Mar’s Restaurant was located at the municipal address of 1824 Orpheum Avenue, with the front of the restaurant facing Orpheum Avenue and the 17th Street Canal, and the rear of the restaurant facing Lake Pontchartrain. Mr. Burgess described Sid-Mar’s Restaurant being outside of the levee protection system.
11BIn his testimony, Mr. Burgess detailed how, beginning in 1972 and continuing until Governor Blanco’s 2006 commandeering order, the “restaurant property” had been fully possessed, -with the intent to own it, by his parents, Sid-Mar’s Restaurant & Lounge, Inc., members of the Shultz family, or some combination thereof.
At the time Sid-Mar’s Restaurant first relocated to its Orpheum Avenue location, the Burgess family leased the restaurant property from the Shultz family. At that time, the Shultzs resided in a house on the western portion of the “restaurant property.” There was a shed behind Sid-Mar’s Restaurant, driveways, landscaping and trees. There was additional parking north of Plane Street that was used by “Bernice’s Seafood.” Mr. Burgess testified that since 1972, there has been no change in the location of Lake Pontchartrain’s shoreline. He testified that he had no memory of the lake ever covering any part of the “restaurant property.”
Mr. Burgess testified that between 1972 and August 29, 2005, no one representing the State, or the EJLD, ever claimed to him that the State owned any part of the property that Sid-Mar’s was occupying. Nor did the State, or the EJLD, take any steps to maintain that property. Mr. Burgess testified that he did not observe any governmental entity maintain the portions of land that extended beyond 15 or 20 feet from the raised portion of the levee, a portion he called the toe of the levee.
Mr. Burgess began working in his parents’ restaurant in 1988 or 1984, eventually taking over its day-to-day operations. He maintained this role until Hurricane Katrina. Mr. Burgess testified that Sid-Mar’s Restaurant & Lounge, Inc. bought the “restaurant property” from the Shultzs in 1991. Mr. Burgess testified that he had maintained the land up to the Coast Guard fence on the western boundary of the “restaurant property.”
1 ifiMr. Burgess admitted that the “restaurant property” subsided over time and that he, his family members, and the Shultzs had occasionally used fill to build up the level of the “restaurant property.” Mr. Burgess also admitted to putting dirt on top of rocks which were on the lake’s shore; however, he claimed that he did not move the lake’s shoreline by this or any other action. Mr. Burgess specifically testified that Sid-Mar’s never had filled any lake bottom in order to make it dry land.
In the early 2000s, Sid-Mar’s entered discussions with the State Land Office. Mr. Burgess testified that, during these discussions, no one from the State Land Office suggested that he or Sid-Mar’s get a reclamation permit, nor did any person from that office suggest that Sid-Mar’s did not own the land it was claiming.
Hurricane Katrina destroyed all the structures on the “restaurant property,” save for a few slabs and pilings. Mr. Burgess testified that after the 2006 commandeering order and the subsequent commencing of construction of the pumping station on the “restaurant property,” *198 he was not allowed to enter the “restaurant property.” Mr. Burgess testified that Sid-Mar’s paid property taxes on the “restaurant property” up until the date of the commandeering order, as well as for the years 2006, 2007, and 2009.
Dr. William D. Reeves, an expert in History and the History of land in South Louisiana, testified regarding several of Sid-Mar’s exhibits which supported Sid-Mar’s argument that the “restaurant property” was never the bed of Lake Pontchartrain. The exhibits discussed by Dr. Re-vees included:
• Exhibit 21-the “1837 Guerard plan”— which was a subdivision of two plantations carried out by Hector D’Corville at somepoint in 1836 or 1837. Dr. Revees explained that sales were made after this subdivision. The “1837 Guerard plan” showed square 128 just north of “Edinburgh Avenue.” Edinburgh Avenue is located in approximately the same location as Old Hammond Highway was later located. This exhibit also shows Plane Street abutting Square [17128 on its north side, as well as, Square 129 abutting Plane Street on its north side.
• Exhibit 30-a plan from 1837-showed Square 128 as the last marked square before Lake Pontchartrain.
• Exhibit 35-a subdivision plan of Square 128 — was found by Dr. Reeves in the Notarial Archives. Dr. Reeves testified that this plan was attached to a June 15, 1877 act before notary W. J. Castell. This map shows the entirety of Square 128 without any encroachment by Lake Pontchartrain.
• Exhibit 36-a map of New Orleans dated 1885-depicts Square 128 as being on dry land. It also shows that north of Square 128 and south of the shoreline of Lake Pontchartrain, was Square 129, which was also depicted as being on dry land.
• Exhibits 49(A) and (B) — maps dated 1917 — showed the now-disputed area. Dr. Reeves testified that the northern boundary of Square 128 was, as shown on these maps, south of Lake Pontchartrain.
In addition to this above testimony relative to historic maps, Dr. Reeves also opined that the 1872 “G.L.O.” meander line was north of the northeast corner of Square 128. Dr. Reeves based his opinion on his analysis of the notes of surveyor “Sulakowski” on which the 1872 “G.L.O.” meander line was based. According to Dr. Reeves, he believed that the 1872 “G.L.O.” meander line was 142 feet further out than Dr. Castille had estimated it to be in his trial testimony.
After evaluating the above evidence, we cannot say that the trial court was manifestly erroneous in failing to find that the “restaurant property” was not formerly part of the bed of Lake Pontchartrain.
The survey plat dated September 13, 1960, which was attached to the quit claim deed by the PLD in favor of Mr. and Mrs. Shultz, appeared to show the shores of Lake Pontchartrain encroaching into the westside of Lots 1, 2, and 3. However, we cannot say that this evidence is a reliable map of the shoreline’s location. First, the purpose of this survey plat was to lay out the relative position and dimensions of Lots 1, 2, and 3, so that the PLD could abandon any claim to 118ownership of Lots 1 and 2, but not Lot 3. Second, while this survey plat measures these three Lots and sets their boundaries, it does not do the same for Lake Pontchartrain’s location. The State also argues that several aerial photographs show that the shoreline of Lake Pontchartrain encroached into all or part of the “restaurant property.” After *199 closely examining these photographs, we cannot say the trial court was manifestly erroneous in finding that the quality of these photographs precluded a finding that they supported survey plats, such as the September 13, 1960 plat, which showed portions of the “restaurant property” under the waters of Lake Pontchartrain.
As to the “shovel tests” performed by Dr. Castille in 2012, the State argues that these tests proved that the dry land upon which the “restaurant property” was situated, during the existence of Sid-Mar’s Restaurant at that location, was the result of artificial filling of Lake Pontchartrain’s bed. We disagree. Dr. Castille’s “shovel tests” consisted of him digging four holes in the “restaurant property” and finding construction debris at depths that were below the lake’s ordinary mean high-water mark. In this circumstance, these tests do not necessarily lead to the conclusion that any of the “restaurant property” was formerly part of the bed of Lake Pontchartrain. Dr. Castille’s “shovel tests” occurred in 2012, several years after Sid-Mar’s had lost possession of the “restaurant property” to the State and the Army Corps of Engineers. Dr. Castille testified that he did not know whether any of the State’s activity, or the Army Corps’ construction of a pumping station, affected the results of his shovel tests. Furthermore, Dr. Castille acknowledged that the “restaurant property” land naturally subsides over time.[11]
The admission from Dr. Castille that the land comprising the “restaurant property” naturally subsides over time is particularly important when considered in | flight of the testimony of Mr. Burgess. Mr. Burgess testified that in the years since Sid-Mar’s Restaurant opened in 1972, he came to take over its operations from his parents. Mr. Burgess testified that in the time since 1972, he and his parents have placed “fill” on the land as it subsides. Although Mr. Burgess admitted that the “restaurant property” subsides and that Sid-Mar is responsible for placing fill on the “restaurant property”, he testified that the “restaurant property” has never been under the waters of Lake Pontchartrain.
Sid-Mar’s position, that the “restaurant property” is not a former lake bed, is also supported by: various 19th century government surveys of the area; Dr. Castille’s testimony that the construction of the 17th Street Canal caused a lowering of the rate of erosion after 1872; as well as various other exhibits showing the “restaurant property” as dry land in the 20th century. Among these 19th century government surveys was a “Map of the Property of The State of Louisiana” signed by the then-Chief State Engineer. It showed the “restaurant property” on dry land when measured both by the original 1837 survey of Lake Pontchartrain’s shoreline, as well as the lake’s shoreline in 1915. Furthermore, the weight of the evidence suggests that Sid-Mar’s “restaurant property” is south of the shoreline of Lake Pontchartrain as surveyed in 1872. First, the legal description of the “restaurant property,” as alleged in Sid-Mar’s petition, places the 1872 shoreline at a point on the northern boundary of the “restaurant property.” Second, several maps in the record show that the area alleged to be the “restaurant property” lays just south of the 1872 survey line showing the shoreline.[12] Furthermore, several photographs showing Sid-Mar’s Restaurant in operation, dated from the 1980s through the early 2000s, showed *200 the “restaurant property” occupying dry land.
|2nHaving considered the evidence in the record, we find that there was sufficient evidence in the record for the trial court to reasonably find that the “restaurant property” was not a former lake bed. Given our conclusion that the trial court did not manifestly err in this finding, we now address the State’s second assignment of error.

Assignment Two

In its second assignment of error, the State argues that the trial court erred in failing to find that Sid-Mar’s could not have gained ownership of the “restaurant property,” except to Lots 1 and 2 within it, through acquisitive prescription because the entirety of the “restaurant property” was owned by the PLD and acquisitive prescription does not run against the PLD. To resolve this claim, we carefully examine the sequence of events that relate to the PLD’s potential claims to the Lots which comprise the “restaurant property:”
• On April 9, 1947, Mr. and Mrs. Shultz bought Lots 1, 2, and 3 from Isabella A. Hunter and Wishart Hunter.
• On March 24, 1949, the PLD Board of Commissioners enacted an appropriation resolution in connection with flood control projects.[13] The area of land included in this appropriation resolution included all of the “restaurant property” now in dispute, as well as other lands.[14]
• On May 10, 1950, Mr. Shultz sued the PLD over this appropriation, arguing that the PLD did not have the legal authority to take his property without just compensation.[15]
• On June 20, 1960, the trial court in the Shultz suit rendered a “judgment in favor of plaintiff, Leroy C. Shultz, and against the defendant, Board of Commissioners for the Pontchartrain Levee District, in the [sum of $5,440.00] dollars, with legal interest ... from March 24, 1949.” In its accompanying reasons for judgment, the trial court explained that the PLD’s defenses for its appropriation were without merit, and that the parties had | ⅞1 stipulated to the $5,440.00 sum as compensation for Mr. Shultz’ property.
• On August 21,1961, the PLD executed a quit-claim deed in favor of Mr. and Mrs. Shultz of all of its rights in Lots 1 and 2, but not Lot 3.[16]
• On January 23,1978, after the death of Mr. and Mrs. Shultz, a judgment of possession was entered in favor of their surviving heirs, Leroy J. Shultz and Ronald J. Shultz, giving them each a undivided ½ ownership interest in, inter alia, “Lots Nos. 1, 2, and 3 of Square 128....”
• On September 30, 1991, Leroy J. Shultz and Ronald J. Shultz sold Lots 1, 2, and 3, together with “any ownership or possessory interest or other right or claims that the [they] may have [had] on lands abutting or contig *201 uous thereto,” to Sid-Mar’s Restaurant & Lounge, Inc.
In Delaune v. Bd. of Com’rs for Pontchartrain Levee Dist., 230 La. 117, 87 So.2d 749 (La.1956), the Louisiana Supreme Court recognized that the law used by the PLD for their appropriation, La. C.C. art. 665, did not by itself impose a servitude in favor of the PLD on lands that fronted a lake such as Lake Pontchartrain. Rather, at the time the PLD passed its appropriation resolution in 1949, La. C.C. art. 665 provided for a servitude on the shores of navigable rivers. In light of the Court’s decision in Delaune, the PLD recognized that its previous resolutions appropriating the Shultzs’ land were illegal because they had not been done with valid authorization. The PLD thereafter paid the Shultzs for Lots 1, 2, and 3. The record indicates that the Shultzs and the PLD stipulated to the price the PLD would pay for these lots.
As shown above, the PLD’s 1949 appropriation of the “restaurant property” was illegal because it took the Shultzs’ land without just compensation. While there is evidence to show that the PLD paid for Lots 1, 2, and 3, there is no evidence to show that the PLD ever paid for the other portions of lots which | ¡.¡.comprised the “restaurant property,” portions of Plane Street, Lot 4, and Lots 19 through 24.
Accordingly, we find no error in the trial court’s conclusion that plaintiffs could own via acquisitive prescription the portions of Lot 4 and Lots 19 through 24 which comprised the “restaurant property.” Additionally, because the PLD sold its interest in Lots 1 and 2 to Sid-Mar’s predecessors in title, Sid-Mar’s had acquisitive prescription run in its favor as to those lots as well. Because the PLD validly paid Sid-Mar’s predecessors in title for Lot 3, and then never sold Lot 3 or otherwise alienated it, the PLD validly owned Lot 3 and Sid-Mar’s could not acquisitively prescribe ownership of that lot. Accordingly, this assignment of error is without merit.

Sidr-Mar’s Answer

Sid-Mar’s answered the State’s appeal arguing that this Court should clarify the trial court’s judgment as it relates to Lot 4 of Square 128, the “Plane Street” area just north of Square 128, and the leased parking lot north of the “Plane Street” area. For the following reasons, we grant the relief Sid-Mar’s seeks.
In its written judgment, the trial court found that Sid-Mar’s owns:
all of the property at issue in this litigation identified as ‘Restaurant Property' except for Square 128, Lot 3.... Specifically, plaintiffs proved ownership of Lots 1 and 2 through chain of title and portions of Lots 19, 20, 21, 22, 23, and 24 of Square 128 through thirty year acquisitive prescription.
In determining the meaning of this judgment, we must ascertain whether the property at issue in this litigation identified as “restaurant property” included the portion of Lot 4 which Sid-Mar’s and the Shultzs possessed. In its petition, Sid-Mar’s described its “restaurant property” as a parcel of land it described as:
Commencing at the comer common to Sections 120 & 192, Township 12 South, Range 11 East, Parish of Orleans, State of Louisiana; thence S 82°47'04" W for a distance of 701.09 feet to a point on the 18721 ¡jjjG.L.O. Meander line on the shore of Lake Pontchartrain. Thence N 85°55'05" W for a distance of 84.85 feet to the point of beginning. Thence N 86°20'42" W for a distance of 198.00 feet to a point, thence S 00°42'29" E along a chain link fence, for a distance of 129.20 feet to a point, thence N 84°50'35" E along a chain link fence, for a distance of 67.66 feet to a point. Thence N 74°37'36" E along a chain link fence, for *202 a distance of 69.65 feet to a point. Thence S 86°20'42" E for a distance of 55.46 feet to a point. Thence N 03°39'18" E for a distance of 95.75 feet to a point, being the point of beginning.
After studying this description, and examining the maps attached to Sid-Mar’s petition, we find that the portion of Lot 4 which is. encompassed by the above description, and the Plane Street area which abuts Square 128 on its north side, are within the definition of the “restaurant property” as that term was used in the trial court’s judgment. Accordingly, we find that the trial court did not fail to rule on the ownership status of this portion of Lot 4 and Plane Street; rather, it simply failed to mention those areas specifically. Just as it did with Lots 19 through 24, Sid-Mar gained ownership of the portion of Lot 4 and the Plane Street area which was within the “restaurant property” through thirty year acquisitive prescription.[17]
As to Sid-Mar’s “economic rights” in the area north of Plane Street which it leased for its parking lot, we find that the trial court did not render judgment. However, given the complete record before us after the trial on the merits, we find that Sid-Mar’s claim has merit. Sid-Mar’s did not possess this leased land as its owner, therefore Sid-Mar’s did not obtain ownership of this land through acquisitive prescription. Nevertheless, Sid-Mar’s did . have an “economic right” in its lease and it is clear from the record that its lease was interfered with by the State’s 2006 commandeering of that property.[18]

\ ^CONCLUSION

For the forgoing reasons, we affirm the judgment of the trial court as it relates to the “restaurant property.” Sid-Mar’s owned the entirety of the property it described as the “restaurant property,” except for the portion of that property within Lot 3, when the State took that property in 2006. Further, Sid-Mar’s “economic rights” in the area north of Plane Street were interfered with by the State’s 2006 commandeering of that property.

AFFIRMED AS AMENDED.

. On September 8, 2006, the State filed a dilatory exception of prematurity. Although it is not clear from the record before us, it appears that this exception was either waived by the State or denied by the trial court.

. The trial court’s order, allowing the EJLD to intervene in this action, rendered moot the State's July 16, 2009 exception of nonjoinder. In that exception, the State had argued that the EJLD was a necessary party in this case because the EJLD had an ownership interest in the property Sid-Mar's claimed in its petition.

. One day before a scheduled hearing on Sid-Mar's June 5, 2009 motion for partial summary judgment, the United States filed a motion in the federal condemnation suit, to stay the state court proceedings in this case. The United States argued that a stay was necessary to aid and protect the federal court’s jurisdiction. The U.S. District Court agreed and, on July 21, 2009, enjoined Sid-Mar’s from prosecuting this state court suit until authorized by the federal court. Sid-Mar's appealed this ruling. On appeal, the U.S. Fifth Circuit affirmed the U.S. District Court’s order staying the state court proceedings. U.S. v. Sid-Mars Restaurant & Lounge, Inc., 644 F.3d 270 (5th Cir.2011).
On December 18, 2012, the U.S. District Court granted Sid-Mar’s motion to allow the Louisiana court to determine state law issues related to the ownership of property disputed in this matter, and lifted the stay on state court proceedings "for the limited purpose of determining title."

. Previous to this judgment, on February 22, 2013, the trial court held a hearing on Sid-Mar's January 15, 2013 motion for partial summary judgment.

. In its oral reasons for denying the State’s March 5, 2013 motion for partial summary judgment, the trial court cited the "dispute about where the applicable shoreline is, [and] the effect of the Pontchartrain Levee District’s appropriation from Mr. Shultz."

. At this location, Sid-Mar's Restaurant had the municipal address of 1824 Orpheum Avenue.

. During this time period, Sid-Mar's also used an area north of the "restaurant property” for customer parking. This parking area was on and just north of where planning maps indicated “Plane Street” should be located. Ownership of the parking area north of the "restaurant property” is not at issue in this appeal.

.Executive Order No. KBB-2006-6 "commandeered” property, such as Sid-Mar’s, by the following text:
*194 Section 1: The state of Louisiana hereby commanders the use of certain property located in the parish of Jefferson, state of Louisiana, Section 121 and 122, Township 12 South, Range 11 East, and land extending north into Lake Pontchartrain, containing approximately 10.2 acres, as shown on the attached map (Exhibit A) entitled "Lake Pontchartrain and Vicinity, New Orleans Plan, Emergency Restoration, 17 th Street Canal Interim Closure Structure, Exhibit A” and dated January, 2006.
Section 2: Said property shall be used for work that will include levee and floodwall construction and repair, constructing [sic] an interim gated closure structure north of the Hammond Highway Bridge, miscellaneous clearing and selective demolition of damaged flood control works, ... including the right to ... perform any other work necessary and incident to the construction of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Project, 17 th Street Outfall Canal Interim Closure Structure, and any appurtenances....
Section 3: The state of Louisiana has commandeered the real property interests for the property required by the Department of the Army as indicated on the attached map (Exhibit A). Said property is commandeered pursuant to R.S. 29:721, et seq. Said owners of the property so commandeered shall be identified and compensated in accordance with the terms of the Cooperation agreement Between the United State of America and the Orleans Levee District for Rehabilitation of a Federal Hurricane/Shore Protection Project executed on October 21, 2005, as supplemented by Supplemental Agreement No. 1, dated January 27, 2006, and as further supplemented by Supplemental Agreement No. 2, dated January 27, 2006.

. We have addressed these assignments of error in reverse order for the sake of clarity of reasoning.

. Mr. D’Angelo performed this work on behalf of the State Land Office.

. Dr. Castille testified that this subsidence of the land occurred at relatively slower rate than land inside the levee protection system.

. This 1872 line is referred to as the ''G.L.O.” meander line.

. The PLD also enacted an appropriate resolution on December 7, 1948.

. The resolution stated that the PLD appropriated "all lands between the levee right of way limits on the shores of Lake Pontchartrain in Jefferson Parish and the water's edge on the Lake side of Lake Pontchartrain.”

. Mr. Shultz’s suit and the resulting judgment also affected his ownership status over Lot 5. We omit discussion of that Lot however as it is not a part of the "restaurant property” now in dispute.

. Mr. and Mrs. Shultz paid $4,005 to the PLD for all of the PLD’s ownership rights in Lots 1 and 2.

. Sid-Mar's did not own the "restaurant property” outside of Lots 1 and 2 of Square 128 through valid title.

. Sid-Mar's economic right in' the parking lot it leased is not contingent upon its lessor having-valid ownership of the leased land.